UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANTHIA MOREL,                                              :

               Plaintiff,                            :          04 Civ. 05578 (LTS) (DF)

     -against-                                     :          **REPORT AND**
                                           **RECOMMENDATION**

JOANNE B. BARNHART, COMMISSIONER             :
OF SOCIAL SECURITY,

                                 :
               Defendant.
-------------------------------------------------------------X

**TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.:**

<u>**INTRODUCTION**</u>

      Defendant, Joanne Barnhart, Commissioner of Social Security ("Commissioner" or "Defendant"), has filed a motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment affirming the decision of the Commissioner that plaintiff Anthia Morel ("Plaintiff") is not entitled to disability insurance benefits or Supplemental Security Income ("SSI") under the Social Security Act.  Plaintiff has cross-moved pursuant to Rule 12(c) for judgment on the pleadings, asserting that the Administrative Law Judge ("ALJ") improperly denied her disability and SSI benefits to which she was entitled, or, in the alternative, that the case be remanded to the Commissioner for further administrative proceedings.

      For the reasons set forth below, and so as to permit full review, I recommend that the case be remanded for further proceedings.

## FACTUAL BACKGROUND

Anthia Morel ("Plaintiff") was born on April 18, 1962 in the Dominican Republic, and came to New York in 1978.  (R. at 58, 90, 439.)[1]  Although Plaintiff testified that she attended high school for one year in New York, completing the 11th grade (*id.* at 439), she reported elsewhere that the highest grade of school she completed was the eighth (*id.* at 70).  Plaintiffs' native language is Spanish (*id.* at 90), and, despite having lived in New York since she was 16 years old, she has difficulty communicating and reading in English (*id.* at 439-40 (testifying that she could not read newspaper in English); *see also id.* at 63, 90).

Plaintiff has some work experience.  After arriving in New York, Plaintiff worked steadily at assorted jobs until 1985.  (*Id.* at 86, 440-41.)  From 1978 to 1985, Plaintiff worked at times in various factories, and at other times as a "home attendant" taking care of elderly individuals.  (*Id.* at 86, 440-41.)   Plaintiff's last job, which she held in 1998 and 1999, was as a babysitter taking care of four children, whose ages ranged from one-and-a-half to three-and-a-half years.[2]  (*Id.* at 436.)  Plaintiff was unable to remember when she stopped working as a babysitter.  (*Id.* at 437.)

Plaintiff claims that she is unable to work due to a combination of physical and psychological problems that arose at various times, including pain in her arm, back pain, asthma, and depression.  (*Id.* at 58, 64, 71.)  According to her SSI application, Plaintiff broke her right arm in 1997, and, after several operations, the arm had not recovered.  (*Id.* at 71.)  She also

---

[1] "R." refers to the record of the administrative proceedings.

[2] Plaintiff initially claimed in her SSI application that she did not work at any time after 1997, when her "illness, injuries or conditions first bother[ed her]."  (*Id.* at 64.)

2

claimed that, at the same time that she injured her arm, she also hurt her back.  (*Id.*)  The medication she was taking for her injuries allegedly did little to relieve her pain.  (*Id.*)

Additionally, Plaintiff stated in her SSI application that she was suffering from depression.  (*Id.*)  She attributed the onset of her depression to "having [her] apartment broken into[,] along with [having] six kids."  (*Id.*)  She claimed that "[m]ost of the time [she did not] even want to get out of bed" and "[s]ometimes [she] just wanted to die."  (*Id.*)

A.   **Medical Evidence**

The medical records that were before the ALJ covered a period from 1998 through 2003, and indicated that Plaintiff had been evaluated and/or treated during that time for the various ailments described in her SSI application.  The medical evidence was as follows:

1.   **Medical Evidence From Treating Sources**

According to her psychiatric records, Plaintiff was admitted for outpatient treatment at the Fordham-Tremont Community Mental Health Center ("CMHC") in July 1999.  (*See, e.g.*, R. at 285; *see also generally id.* at 272-414.)  She continued to receive treatment from CMHC through, at least, February 2003.  (*See id.* at 393.)  Plaintiff underwent an initial mental status evaluation on September 14, 1999.  (*Id.* at 278-80.)  The evaluation indicated that Plaintiff was feeling "fearful because she was burglarized."  (*Id.* at 278.)  Plaintiff was diagnosed with generalized anxiety disorder as she was "fearful of another robbery," "anxious, specifically [at] night," and having trouble sleeping.  (*Id.* at 280.)  Several months later, on January 25, 2000, Plaintiff was evaluated a second time.  (*Id.* at 282-84.)  Based on findings similar to those made in the September 1999 evaluation, a psychiatrist diagnosed Plaintiff with post-traumatic stress disorder ("PTSD").  (*Id.*)

As part of her treatment at CMHC, Plaintiff attended individual and group therapy sessions with a psychiatrist and/or clinical psychologist, and she also underwent quarterly comprehensive treatment plan reviews.  She was prescribed several medications for her depression, anxiety and insomnia, including Zoloft, Ambien, and Vistaril.  (*Id.* at 260, 271.)  The individual therapy sessions began sometime in or around October 1999.  (*Id.* at 317.)  During the individual therapy sessions, Plaintiff continued to complain of fearfulness, anxiety, and insomnia.  (*Id.* at 317-349, 355, 361, 367, 372, 377, 384, 399, 401, 406.)

Plaintiff's quarterly comprehensive treatment plans also described Plaintiff as feeling depressed and anxious, as well as noting that she was unable to sleep and suffering from somatic issues.[3]  The earlier treatment plans, from March 22, 2001 through September 28, 2001, noted that Plaintiff "fear[ed] that something [could] occur," that Plaintiff "doesn't like to be alone in her apartment," and that she had a "fearful sense of doom."  (*Id.* at 286, 289, 292.)  According to a plan prepared on September 28, 2001, Plaintiff's PTSD was "reactivated" by "a recent fire in her apartment" which forced her to move to a different apartment and resulted in "total loss." (*Id.* at 292.)   During this period, Plaintiff was assessed as having a Global Assessment Functioning ("GAF") score of 60.[4]  (*Id.* at 285, 288, 291.)  As of December 28, 2001, the

---

[3] "Somatic" is defined as "[r]elating to the soma or trunk, the wall of the body cavity, or the body in general."  *PDR Medical Dictionary* 1655 (2d ed. 2000).

[4] The GAF is a numeric scale of 0 to 100 used to rate the overall psychological functioning of adults.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. text rev. 2000).  A higher number indicates a higher level of functioning.  *See id.*  A GAF score of 51-60 indicates "[m]oderate symptoms . . . or moderate difficulty in social, occupational or school functioning."  *Id.* at 34.  A GAF score of 61-70 indicates "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, and has some meaningful interpersonal relationships."  *Id.*

treatment plans indicated that Plaintiff's overall condition had somewhat improved.  Plaintiff's GAF rating increased from 60 to 65 (*id.* at 294, 297, 300, 303, 306); her anxiety was described as less debilitating (*id.* at 295, 298, 301, 304); and she was reported as feeling "calmer in [her] new apartment" (*id.* at 295).  During this period, Plaintiff, however, remained "somewhat depressed," traumatized, anxious, and unable to sleep without medication, and she continued to suffer from several somatic issues.  (*See, e.g.*, *id.* at 295, 301, 304, 305.)

Plaintiff was referred to group therapy on July 20, 2001.  (*Id.* at 349.)  Plaintiff, for the most part, attended weekly sessions from July 24, 2001 through February 13, 2003.  (*Id.* at 351-54, 357-58, 360, 363-66, 368-71, 373-74, 376, 378-83, 385-94, 396, 397-98, 400, 402-05, 407-14.)  At these group sessions, group members primarily discussed how they were feeling and any relevant life events.  (*See generally id.*)  In these sessions, Plaintiff complained of physical pain in her back and legs, expressed frustration over an inability to obtain social security benefits, and discussed the fire in her apartment.  (*See, e.g.*, *id.* at 357, 358, 360, 363, 364, 366, 397, 405.)  On several occasions, Plaintiff described herself as depressed, sad, insecure, anxious, and fearful. (*See, e.g.*, *id.* at 363, 366, 370, 374, 390, 398.)  Progress notes also indicated that, on or about August 8, 2002, Plaintiff traveled to the Dominican Republic.  (*Id.* at 373, 376.)  Plaintiff stayed in the Dominican Republic for approximately six weeks, before returning to New York.  (*Id.*)

The administrative record also includes responses by a psychiatrist, Dr. Colette Bruni-Confini, dated December 19, 2003, to a "Questionnaire as to Residual Functional Capacity:  Psychiatric Impairment."[5]  (*Id.* at 423-26.)  In her questionnaire responses, Dr. Bruni-

---

[5] It appears from the record that Dr. Bruni-Confini was employed by CMHC at the time she completed the December 2003 questionnaire.  (*See id.* at 423 (noting that Plaintiff was admitted for outpatient treatment on July 1, 1999); 66, 426 (identifying address as "2021 Grand Concourse, Bronx, NY," the same address listed for CMHC on Plaintiff's SSI application).)

Confini described Plaintiff's psychiatric symptoms as: "depressed mood, anxious, sadness, fears, poor sleep, irritability, phobias, [and] crying spells." (*Id.* at 423.) Dr. Bruni-Confini determined that Plaintiff's GAF score was 63 and diagnosed Plaintiff with PTSD. (*Id.* at 424.) Dr. Bruni-Confini's responses also indicated that Plaintiff could travel alone by bus and by subway, but the doctor stated that Plaintiff's psychiatric impairments "seriously affect[ed] her ability" to engage in "activities of daily living," to function socially, and to respond to customary work pressures. (*Id.* at 424, 425-26.) Further, Dr. Bruni-Confini noted that Plaintiff's psychiatric condition affected but did not preclude her from concentrating or allowing her to complete tasks in a timely manner. (*Id.* at 425.) Dr. Bruni-Confini indicated that, in a workplace environment, Plaintiff would be "moderately" limited by her psychiatric impairment in understanding, remembering, and carrying out instructions, responding appropriately to supervision and co-workers, and performing simple tasks. (*Id.* at 425-26.) Dr. Bruni-Confini concluded that Plaintiff needed to be in a low pressure environment, as her "multiple medical issues" could impact her daily living tasks. (*Id.* at 426.)

In addition to including mental health records, the administrative record also included certain of Plaintiff's physical health records from Columbia-Presbyterian Medical Center ("CPMC") (*id.* at 192-212) and Dr. Dean Basulto,[6] who worked at CPMC and was Plaintiff's primary care physician (*id.* at 415, 435). According to her records from CPMC, Plaintiff underwent surgery on her right arm in 1998, when doctors removed hardware from her right ulna. (*Id.* at 195-96, 201.) CPMC records indicated that an x-ray of Plaintiff's spine was taken

---

[6] The parties refer to Dr. Basulto as both "Dr. Basulto" (*see, e.g.*, Def. Mem. at 18-19) and "Dr. Dean" (*see, e.g.*, Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, dated Apr. 18, 2005 ("Pl. Mem.") (Dkt. 15), at 4-5); as noted here, it appears from the record that "Dean" is Dr. Basulto's first name (*see* R. at 415, 421).

on November 15, 2000, showing no evidence of "bony or ocular abnormality." (*Id.* at 206.) The

hospital also administered a Magnetic Resonance Imagining ("MRI") of Plaintiff's spine on

April 6, 2001, which revealed that Plaintiff was suffering from a "[f]ocal central annulus tear at

the L5-S1 intervertebral disc space with a minimal central disc bulge." (*Id.* at 204-05.) A

second x-ray of Plaintiff's spine, performed on February 2, 2002, showed "[n]o evidence of

fracture or dislocation in the C-Spine." (*Id.* at 207.)

Dr. Basulto, who saw Plaintiff every three or four months from September 1, 1998 until

at least March 2003, submitted two reports to the ALJ. (*Id.* at 78, 417-21). The first of these

reports, dated March 8, 2002, indicates that, based on the April 6, 2001 MRI, Plaintiff had

"Chronic Low Back Pain Syndrome due to L5-S1 central annulus tear and minimal central disc

bulge." (*Id.* at 78.) Dr. Basulto also described Plaintiff as suffering from "asthma, depression,

obesity, iron deficiency, and osteoarthritis." (*Id.*) Dr. Basulto concluded that, due to Plaintiff's

conditions, Plaintiff was "unable to work" at that time. (*Id.*)

In addition to the March 2002 report, Dr. Basulto also submitted responses to a

"Questionnaire as to Residual Functional Capacity: Physical Impairment," dated December 16,

2003. (*Id.* at 417-21.) According to Dr. Basulto's questionnaire responses, the last time that

Plaintiff visited him was "March 2003." (*Id.* at 417.) In his responses, Dr. Basulto, citing to the

2001 MRI and 2002 X-ray, diagnosed Plaintiff with: "depression, asthma, Chronic Low Back

Pain Syndrome, osteoarthritis, obesity, . . . anemia, and diabetes." (*Id.* at 417-18.) Dr. Basulto

further explained that a disc bulge, as documented on the MRI scan, was contributing to

Plaintiff's chronic musculoskeletal back pain. (*Id.* at 418.) Dr. Basulto, stated, however, that he

was "unable to complete" the "Functional Capacity" portion of the questionnaire "based on information in [Plaintiff's] chart." (*Id.* at 419.)

### 2.    <u>Medical Evidence from Consulting Sources</u>

Plaintiff underwent three consultative examinations on August 21, 2001, and another consultative examination on December 20, 2001.  Additionally, Plaintiff's medical records were reviewed by a state psychiatrist on February 21, 2002.  In a report dated August 21, 2001, Dr. Anetero Sarreal, a consultative orthopedist, noted that Plaintiff's upper extremities had "good control and coordination"; she had no sensory impairment; and her hands had "good dexterity and manipulation."  (R. at 214, 215.)  The doctor's report described Plaintiff's cervical and lumbar spine as having a decreased range of motion with tenderness and spasm, although the doctor also indicated that Plaintiff's hip and ankles had full range of motion.  (*Id.* at 215-16.) The doctor diagnosed Plaintiff with:  "status-post fracture operation of the right forearm," "low back derangement with atrophy of the left thigh and right leg musculature," "obesity," "history of depression," and "history of bronchial asthma."  (*Id.* at 216.)  With regard to her "functional capacity to perform work-related activities," Dr. Sarreal concluded that Plaintiff was limited, at least to some degree, in "lifting and carrying heavy objects, pushing and pulling, prolonged standing, [and] long distance ambulation," as well as in squatting, bending, climbing, sitting, crouching, stooping, and balancing.  (*Id.*)  Moreover, the doctor noted that Plaintiff should not be overly exposed to extreme temperatures, dust or fumes.  (*Id.*)  Dr. Sarreal did find, however, that there was no limitation in Plaintiff's "manipulative use of both hands," and that Plaintiff could engage in "light physical exertion."  (*Id.*)

Also on August 21, 2001, Dr. Cristiana Bortuzzo conducted a consultative physical examination of Plaintiff.  (*Id.* at 219-22.)  According to the report, Plaintiff's gait and station were normal; she had no difficulty getting on and off the examination table; she could dress and undress using both arms; she demonstrated a full range of motion in the upper extremities with 4/5 grip strength; and she had no back deformities and no paraspinal spasm or tenderness in her back.  (*Id.* at 221.)  Dr. Bortuzzo did find, however, that Plaintiff was limited in her ability to raise her legs, bend her knee and forward flex at the hip, and that she was unable to heel or toe walk or to squat.  (*Id.*)  The doctor also noted that Plaintiff was wearing a Transcutaneous Electrical Nerve Stimulator unit (more commonly know as a "TENS" unit) on the left side of her back.  (*Id.*)  Dr. Bortuzzo's diagnostic impression included a "history of asthma," "complaint of chronic back pain," and a "history of depression."  (*Id.* at 221-22.)  Based on her findings and Plaintiff's history, Dr. Bortuzzo concluded that Plaintiff appeared "to be able to perform sedentary, light to moderate work activity."  (*Id.* at 222.)

On that same date, Plaintiff was evaluated by a consultative psychiatrist, Dr. Robert Cicarell.  (*Id.* at 226-28.)  Dr. Cicarell found that Plaintiff's speech and thought processes were normal, her memory was fair, and her "overall intellectual functioning [was] within normal limits," but that her concentration and attention were "markedly impaired."  (*Id.* at 227.)   The report also indicated that Plaintiff's affect was "moderately depressed."  Dr. Cicarell diagnosed Plaintiff with "dysthymic disorder."  (*Id.*)  According to Dr. Cicarell's report, Plaintiff was capable of handling her own funds, but was limited in her "ability to understand, carry out and remember instructions in a work setting."  (*Id.* at 228.)

9

_____On December 20, 2001, Dr. Steven Rocker, a consultative physician of internal medicine, examined Plaintiff.  (*Id.* at 229-31.)  According to Dr. Rocker's report, Plaintiff had no trouble getting on or off the examination table; her gait and station were normal; she could dress and undress using both hands and arms; and there was no tenderness or spasm in her lower back.  (*Id.* at 230-31.)  The doctor also found that Plaintiff's right and left lateral flexion of the lumbosacral spine was reduced to fifteen degrees, but all other joints had a full range of motion without swelling, warmth, or tenderness.  (*Id.* at 231.)  Plaintiff could heel walk, toe walk, and tandem walk without difficulty.  (*Id.*)  X-rays suggested that Plaintiff had previously fractured her left elbow.  (*Id.*)  The doctor's diagnostic impression was "low back pain," "history of asthma," "moderate obesity," and "history of depression."  (*Id.*)  Dr. Rocker found that Plaintiff was "physically able to perform sedentary, light and some moderate activity."  (*Id.*)

Finally, on February 22, 2002, Dr. P. Mason, a non-examining consultative psychiatrist, employed by the Social Security Administration ("SSA"), examined Plaintiff's records and completed a "Mental Residual Functional Capacity Assessment" and a "Psychiatric Review Technique" form.  (*See id.* at 242-59.)  Although the copies of Dr. Mason's reports included in the administrative record are faint and therefore somewhat difficult to read, it appears that Dr. Mason diagnosed Plaintiff with an "affective disorder."  (*See id.* at 246.)  Dr. Mason found that Plaintiff had "moderate difficulties in maintaining concentration, persistence, [and] pace."  (*Id.* at 256.)  Dr. Mason also determined that Plaintiff was mildly limited in engaging in "activities of daily living" and "maintaining social functioning."  (*Id.*)

B.    **The Hearing**

At a hearing held on December 22, 2003, before ALJ Kenneth L. Scheer, Plaintiff testified that she was unable to work because of "psychiatric problems."  (R. at 433, 441.) Additionally, Plaintiff indicated that her ability to function was affected by her asthma, although she had never been hospitalized for it.  (*Id.* at 444.)  Plaintiff also claimed that she needed a cane to move around because of pain in her hip and because she was unable to balance properly.  (*Id.*) Plaintiff testified that, ordinarily, she spent days in her house lying down because she could not sit or stand for long periods of time.  (*Id.* at 445-46.)  She testified that she could only walk for half a block before experiencing pain, and that she was unable to bend.  (*Id.*)  Plaintiff further testified that, although she cooked on occasion, she could not dance or go shopping due to her physical conditions.  (*Id.* at 442, 445.)  Plaintiff also indicated that, since 1996, she had been injured twice in motor vehicle accidents and had been treated for her injuries.  (*Id.* at 437, 444.) In identifying recent traumatic events, Plaintiff testified that her husband had killed himself.  (*Id.* at 446.)  Finally, Plaintiff admitted that, in 1998 and 1999, she had been paid to take care of four children.  She testified that she was paid between $75.00 and $80.00 per week for each child (*id.* at 436-37), and she also noted that she never had to lift the children (*id.* at 449).

Edna Clark ("Clark"), a vocational expert, also testified at the December 2003 hearing. (*Id.* at 433, 447-51.)  She testified that babysitting is "a medium exertional level job as typically performed in the national economy [and] semi-skilled."  (*Id.* at 449.)  Based on Plaintiff's testimony, however, Clark determined that Plaintiff performed the job at the sedentary to light level, as she never had to pick up the children that she was babysitting.  (*Id.*)  Clark further testified that a hypothetical individual with the same education, age and work experience as

Plaintiff, who could perform light work that was low stress, simple and included repetitive tasks, with no concentrated exposure to dust, fumes, gases, extremes of heat and cold, could perform Plaintiff's past relevant work as a babysitter.  (*Id.* at 449-50.)

## PROCEDURAL BACKGROUND

Plaintiff first filed an application for SSI benefits on April 18, 2001.  (R. at 28.)  The SSA denied Plaintiff's application on February 27, 2002, determining that Plaintiff's condition was not severe enough to keep her from working.  (*Id.* at 29-32.)

After her application was initially denied, Plaintiff requested a hearing before an ALJ. (*See id.* at 16, 35.)  The hearing was held on December 22, 2003.  (*Id.* at 16, 40, 433-51.)  It appears that Plaintiff was represented by a non-attorney at the hearing (*see id.* at 11, 16, 433, 434),[7] and that she testified, in the manner described above, with the aid of a Spanish interpreter (*id.* at 433).  At the conclusion of the hearing, the ALJ informed Plaintiff that he did not have all of the medical information he needed to make a fair decision.  (*Id.*)  Accordingly, the ALJ notified the Plaintiff that he would accept additional evidence from the Plaintiff's psychiatrist or therapist before rendering his decision.  (*Id.* at 450-51.)  It is not clear from the record, however, whether any of the evidence contained therein was in fact submitted after the date of the hearing.

On February 25, 2004, the ALJ issued a decision denying Plaintiff's application for benefits.  (*Id.* at 16-25.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 29, 2004.  (*Id.* at 5-7.)

---

[7] Although there is some confusion in the record, it appears that Plaintiff's representative at the December 2003 hearing, Yvonne Gonzalez of Bronx Independent Living Services ("Gonzales"), was not an attorney.  (*Compare id.* at 11 ("non-attorney" box checked above Gonzalez's signature) *and id.* at 16 (noting in decision following December 2003 hearing that "Yvonne Gonzalez, a non-attorney, represents the claimant in this matter") *with id.* at 433 (referring to Gonzalez as attorney) *and* Def. Mem. at 1.)

On July 19, 2004, Plaintiff filed her Complaint in in this Court.  (*See* Complaint, dated June 1, 2004 (Dkt. 2).)

## DISCUSSION

I.      **STANDARD OF REVIEW**

Pursuant to the Social Security Act, 42 U.S.C. § 405(g) ("the Act"), the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive."  *Id.* Substantial evidence has been defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations and citation omitted).  Thus, where the Court finds that substantial evidence exists to support the ALJ's determination, the decision will be upheld, even if contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (decision affirmed where there was substantial evidence for both sides).  This standard applies to findings of fact as well as to inferences and conclusions drawn from such facts.  *See Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966); *D'Amato v. Apfel*, No. 00 Civ. 3048 (JSM), 2001 WL 776945, at *3 (S.D.N.Y. July 10, 2001).

The Court, however, must also review the ALJ's decision to determine whether the ALJ applied the correct legal standard.  *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  "'Where an error of law has been made that might have affected the disposition of the case, th[e] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'"  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir.

1982)).  Thus, the Court reviews *de novo* whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles.  *See id.*; *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

In situations where the ALJ has failed to report his or her findings with specificity, the Court may remand for further clarification.  *See, e.g.*, *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) ("'When there are gaps in the administrative record . . . we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.'" (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980))).

## II.   THE FIVE-STEP PROCEDURE PRESCRIBED BY THE SOCIAL SECURITY REGULATIONS

In order to establish entitlement to benefits under the Act, a plaintiff must establish that he or she has a "disability."  *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  The term "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Moreover, under 42 U.S.C. § 423(d)(2)(A):

> [a]n individual shall be determined to be under a disability only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work.

In evaluating a disability claim, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 404.1520; *Diaz v. Shalala*, 59 F.3d 307, 311 n.2 (2d Cir. 1995); *Berry v. Schweiker*, 675 F.2d

14

464, 467 (2d Cir. 1982) (per curiam).  First, the ALJ must determine whether the claimant is

engaged in substantial gainful activity.  *See* 20 C.F.R. § 404.1520.  If not, the second step

requires the ALJ to consider whether the claimant has a "severe impairment" that significantly

limits his or her physical or mental ability to do basic work activities.  *Id.*  If the claimant does

suffer such an impairment, then the third step requires the ALJ to determine whether this

impairment "meets or equals a listed impairment in Appendix 1" of the regulations.  *Id.*  If the

claimant's impairment meets or equals one of those listed, the claimant is presumed to be

disabled "without considering the [claimant's] age, education, and work experience.  *Id.*  If the

presumption does not apply, then the fourth step requires the ALJ to determine whether the

claimant is able to perform his or her "past relevant work."  *Id.*  Finally, if the claimant is unable

to perform his or her past relevant work, the fifth step requires the ALJ to determine whether the

claimant is capable of performing "any other work."  *Id.*

        In making a determination by this process, the ALJ must consider four sources of

evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and

(4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d

59, 62 (2d Cir. 1999) (internal quotations and citation omitted).

        Under the procedure set out in the governing regulations, "[t]he claimant bears the initial

burden of showing that h[er] impairment prevents h[er] from returning to h[er] prior type of

employment."  *Berry*, 675 F.2d at 467 (citations omitted); *see also* 20 C.F.R. § 404.1520.  Once

it has been determined that the claimant cannot perform her past relevant employment, the

Commissioner then has "the burden of proving that the claimant still retains a residual functional

capacity to perform alternative substantial gainful work which exists in the national economy."
*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); *see also Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984) ("The burden of proving disability is on the claimant.  However, once the claimant has established a prima facie case by proving that his impairment prevents his return to his prior employment, it then becomes incumbent upon the Secretary to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training." (citations omitted)); 20 C.F.R. § 404.1520.

## III.   **THE ALJ'S DETERMINATION**

In this case, the ALJ, after proceeding through each of the steps listed above, determined that Plaintiff was not disabled.

First, the ALJ found, and it is undisputed, that Plaintiff had not engaged in substantial gainful work activity since her date of filing, April 18, 2001.  (R. at 17.)

Second, the ALJ concluded that Plaintiff had a history of the following medical conditions:  (1) PTSD; (2) lower back pain; and (3) asthma, all considered severe under the Social Security regulations.[8]  (*Id.* at 20, 24.)

Third, the ALJ found that, despite these conditions, Plaintiff did not have impairments that met or equaled in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P of the Social Security regulations.  (*Id.* at 20, 24.)

---

[8] The Social Security regulations define "severe" in these terms:  "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 416.921(a).

Fourth, the ALJ concluded that Plaintiff retained the residual functional capacity to perform her past relevant work.  (*Id.* at 23-24.)  Analyzing Plaintiff's testimony, her symptoms, and the extent to which those symptoms could reasonably be accepted as consistent with objective evidence, the ALJ determined that Plaintiff's allegations regarding her limitations were not entirely credible.  (*Id.* at 24; *see also id.* at 22.)  The ALJ also rejected the findings and conclusions of Plaintiff's treating physicians, Dr. Bruni-Confini and Dr. Basulto.  (*Id.* at 19, 23.)  The ALJ accorded "little evidentiary weight" to their opinions as they were inconsistent with other evaluations and, in the ALJ's view, not supported by objective medical evidence (*i.e.*, clinical notes or actual reports).  (*Id.* at 19, 23.)  The ALJ relied instead on other records from CMHC and CPMC, as well as evaluations by the consultative physicians.  (*Id.* at 18, 19, 20, 23.)  In concluding that Plaintiff retained the ability to meet "the basic mental demands of competitive work," the ALJ found that Plaintiff was "capable of following and understanding simple directions and instruction," was "able to maintain attention and concentration for simple job related tasks," and possessed "adequate social skills."  (*Id.* at 20.)  As to Plaintiff's physical conditions, the ALJ concluded that, although her impairments were "severe," Plaintiff retained the residual functional capacity to lift and carry up to 10 pounds frequently and 20 pounds occasionally, and to sit, stand or walk for extended periods of up to six hours during an eight-hour workday.  (*Id.* at 22.)

In addition, the ALJ accorded great weight to the opinion of Clark, an impartial vocational expert, who testified that, based on Plaintiff's residual functional capacity, she could return to her past work as a babysitter.  (*Id.* at 23.)  Based on the record evidence from CMHC, CPMC, consultative physicians and Clark's testimony, the ALJ concluded that, as Plaintiff's

17

capacity to work included the ability to perform her previous work as a babysitter, Plaintiff was

not disabled, and thus she was not entitled to SSI benefits.  (*Id.* at 22, 23, 24.)  The ALJ did not

find it necessary to reach the fifth step of the analysis.

As the ALJ followed the five-step procedure set forth in the Social Security regulations,

this Court's review is limited to determining whether, in the course of following that procedure,

the ALJ correctly applied the relevant legal principles, and whether his decision is supported by

substantial evidence.  In addition, the Court must determine whether the ALJ's findings are

sufficiently complete and specific to allow for full review of his determination.

### A.    Whether the ALJ Accorded Sufficient Deference to the Opinions of Plaintiff's Treating Physicians

The ALJ must give "controlling weight" to a treating physician's opinion, as long as

the treating physician's "opinion on the issue(s) of the nature and severity of [the]

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record."

20 C.F.R. § 404.1527(d)(2).  Even where the treating physician's opinion is not entitled to

"controlling weight," the Social Security regulations set forth "several factors that should induce

the ALJ to give greater weight to that opinion, including the frequency of examination, the

length, nature, and extent of the treating relationship, the supportability of the medical findings,

the opinion's consistency with the record, and whether the physician is a specialist in treating the

condition in question."  *Dhanraj v. Barnhart*, No. 04 Civ. 5537 (MBM), 2006 WL 1148105, at

*8 (S.D.N.Y. May 1, 2006) (citing 20 C.F.R. § 404.1527(d)); *see also Shaw v. Chater*, 221 F. 3d

126, 134 (2d Cir. 2000) (finding that ALJ violated treating physician rule where ALJ failed to

give treating physician's opinion "controlling or at least greater weight"); *Cruz v. Sullivan*, 912

F. 2d 8, 12 (2d Cir. 1990) ("[T]he opinion of a treating physician on the subject of medical disability is (1) binding on the fact-finder unless contradicted by substantial evidence and (2) entitled to some extra weight, even if contradicted by substantial evidence, because the treating source is inherently more familiar with a claimant's medical condition." (internal quotations and citation omitted)).

The ALJ is also required to give "good reasons" for the weight he or she assigns to the treating source's opinion. 20 C.F.R. § 404.1527(d)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998)). This "requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases even – and perhaps especially – when those dispositions are unfavorable." *Id.* at 134.

In this case, there is a question as to whether the ALJ properly applied the "treating physician" rule, specifically with regard to Dr. Bruni-Confini.[9] Plaintiff contends that the ALJ erroneously identified Dr. Bruni-Confini as a therapist, rather than as a physician, and thus did

---

[9] The administrative record, in its current state, does not demonstrate the frequency of Plaintiff's visits to Dr. Bruni-Confini, and indeed only contains a single report from this doctor. (*See* R. at 19, 423-26.) Case law suggests that more than a single patient visit may be necessary for a physician to be characterized properly as a "treating physician." *See Jones*, 66 F. Supp. 2d at 525 ("A 'treating physician' is the claimant's own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." (internal quotation marks and citation omitted)). The Commissioner, however, does not argue this point, but rather accepts, if only for purposes of this motion, that Dr. Bruni-Confini was, in fact, one of Plaintiff's treating physicians. (*See* Defendant's Reply Memorandum, dated May 9, 2005 ("Def. Reply") (Dkt. 16), at 6 (asserting that "ALJ correctly viewed this report as evidence from a treating physician"); *see also generally id.* at 6-8.)

not evaluate her December 2003 questionnaire responses under the correct standard.  (*See* Pl.

Mem. at 18-19; Plaintiff's Reply Memorandum of Law, dated Apr. 18, 2005 ("Pl. Reply") (Dkt.

17), at 3-5.)

      Dr. Bruni-Confini stated in her December 2003 questionnaire responses that Plaintiff

suffered from marked impairments in performing everyday activities, functioning socially, and

responding to customary work pressures.  (R. at 425-26.)  In rejecting these conclusions, the ALJ

misidentified Dr. Bruni-Confini as "Celeste Brim" (presumably based on a misreading of

Dr. Bruni-Confini's signature of "Colette Bruni" (*see id.* at 426)), and called her a "therapist."

(*Id.* at 19.)  The ALJ also made clear that he did not believe that Dr. Bruni-Confini was a

physician, as he called her "Ms. Brim" and also stated that "it is important to note[] that as a

therapist, Ms. Brim's assessment is not also signed by a Psychiatrist, or other overseeing

physician."  (*Id.*)  While conceding that the ALJ misidentified Dr. Bruni-Confini (Def. Reply

at 5), the Commissioner maintains that this error did not affect the ALJ's ultimate determination

and that remand on this point is therefore unnecessary (*id.* at 6-7).

      The Commissioner is correct that remand is not required where an ALJ's error –

including an error in the application of the "treating physician" rule – is harmless.  *See*

*Duvergel v. Apfel*, No. 99 Civ. 4614 (AJP), 2000 WL 328593, at *11 (S.D.N.Y. Mar. 29, 2000)

(applying harmless error rule to review of denial of disability benefits) (collecting cases);

*Walzer v. Chater*, No. 93 Civ. 6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995)

("ALJ's failure to discuss a treating physician's report was harmless error where consideration of

report would not have changed outcome.").  Here, however, it cannot be said with certainty that

the ALJ's error was harmless.  Although, in referring to Dr. Bruni-Confini's report, the ALJ

acknowledged that "pertinent regulations generally provide that greater weight is accorded to treating physician and treating source opinions" (R. at 19) and gave reasons for discrediting the report (*see id.*), the ALJ appeared to suggest that, because that report was not, to his understanding, signed by a physician, it was entitled to less deference.  The ALJ's note that it was "important" to recognize that the report was not signed by a physician creates doubt as to whether the ALJ gave Dr. Bruni-Confini's report the full benefit of the treating physician rule.[10] As it cannot be determined from the record whether the ALJ accorded the appropriate degree of deference to Dr. Bruni-Confini's report, and as greater deference may have led to a determination in Plaintiff's favor, it would be appropriate for the Court to remand the matter to the ALJ for reconsideration or at least clarification on this point.

### B.      Whether the ALJ Took Adequate Steps To Develop the Record

When the ALJ has received evidence from a claimant's treating physician or other medical source, but that evidence is insufficient to enable the ALJ to determine whether the claimant is disabled, the ALJ is required to "recontact" the claimant's physician or other source "to determine whether the additional information [the ALJ] need[s] is readily available." 20 C.F.R. § 404.1512(e)(1).  The ALJ is also required to "seek additional evidence or clarification" from the claimant's treating physician or other medical source when the report received from that source "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  *Id*.  The ALJ, however, is not obligated to "seek

---

[10] Further, any error by the ALJ in his application of the treating physician rule may have been magnified by his failure to make reasonable efforts to obtain Dr. Bruni-Confini's own treatment or progress notes, as discussed *infra* at Point III(B)(1).

additional evidence or clarification from a medical source," when the ALJ knows "from past experience that the source either cannot or will not provide the necessary findings." *Id.* § 404.1512(e)(2).

"[I]n cases involving *pro se* plaintiffs, this affirmative duty" to develop the record "is heightened." *Jones v. Apfel*, 66 F. Supp. 2d 518, 523-24 (S.D.N.Y. 1999) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *see also Dimitriadis v. Barnhart*, No. 02 Civ. 9203 (DC), 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004). In this context, the ALJ's duty entails more than simply requesting reports from treating physicians. *Jones*, 66 F. Supp. 2d at 524. An ALJ is also obligated to issue and enforce subpoenas requiring the production of evidence, as well as advise the plaintiff of the importance of the evidence. *Id.* (citing 42 U.S.C.A. § 405(d)). When a claimant appears *pro se*, "the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability." *Dimitriadis*, 2004 WL 540493, at *9 (citation omitted).

Here, although Plaintiff was represented at the December 2003 administrative hearing before the ALJ, the individual who represented her was not an attorney. (*See supra* at n.7.) Under the circumstances, the ALJ had a heightened obligation to develop the record similar to that required of an ALJ in a case involving a *pro se* claimant. *See Dimitriadis*, 2004 WL 540493, at *10 (applying heightened standard where Plaintiff was represented by someone who was not an attorney); *see also Rivera v. Barnhart*, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) ("'The ALJ's duty to develop the comprehensive record requisite for an equitable determination

of disability is greatest when claimant is unrepresented; the duty still exists when plaintiff is represented and even more . . . where plaintiff is represented at hearing by a paralegal.'" (quoting *Smith v. Bowen*, 687 F. Supp. 902, 906 (S.D.N.Y. 1988))); *Pagan v. Chater*, 923 F. Supp. 547, 554 (S.D.N.Y. 1989) (where claimant represented by legal assistant, and not attorney, "ALJ ha[d] a duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts" (internal quotation marks and citation omitted)).

### 1.      The Absence of Evidence from the Records of Dr. Bruni-Confini

Dr. Bruni-Confini responded to a questionnaire in December 2003 seeking information regarding Plaintiff's capacity.  The administrative record, however, is devoid of treatment notes or other documentation from this doctor to support the opinion stated in her response:  that Plaintiff suffered from psychiatric impairments that "seriously affect[ed] her ability" to engage in "activities of daily living," "function socially," and to respond to the customary pressures of the workplace.  (R. at 424, 425-26.)  The ALJ discounted Dr. Bruni-Confini's questionnaire responses because they lacked objective support, and also because he found the responses to be inconsistent with progress notes from the CMHC and evaluations from the consultative physicians.  Yet, prior to rejecting Dr. Bruni-Confini's opinion, the ALJ apparently made no effort to obtain additional information from this doctor.  If asked, Dr. Bruni-Confini may have been able to provide support for her findings.

The Commissioner argues that Dr. Bruni-Confini's conclusions do not, in any event, establish that Plaintiff was disabled or unable to work.  (Def. Reply at 7-8.)  In other words, according to the Commissioner, even if the ALJ had fully credited Dr. Burni-Confini's opinion, there would still be no basis to find that Plaintiff was disabled within the meaning of the Social

Security regulations.  (*Id.*)  The record, however, does not support the Commissioner's argument on this point.  The ALJ characterized Dr. Bruni's opinion as showing that Plaintiff suffered from "profound psychiatric limitations."  (R. at 19.)  Although this statement does not conclusively establish that Plaintiff was disabled for purposes of the Social Security regulations, as suggested by Plaintiff,[11] it does, at a minimum, create a question as to how the ALJ might have decided the case had he credited Dr. Bruni-Confini's assessment.

As the record contains no indication that the ALJ sought to obtain further information from Dr. Bruni-Confini, remand is warranted so that the record may be further developed in this regard.  *See Horton v. Barnhart*, No. 03 Civ. 0076 (HB), 2004 WL 514759, at *3 (S.D.N.Y. Mar. 15, 2004) (ordering remand where no indication in record that ALJ made efforts to determine author of letter whose signature was illegible, and where author of letter concluded Plaintiff was unable to work); *Dimitriadis*, 2004 WL 540493, at *11 (even where ALJ unaware that doctor had treated claimant until administrative hearing, and only evidence of treatment was plaintiff's medication form indicating that doctor had prescribed medication for plaintiff, ALJ was nonetheless obligated to obtain medical records and opinion from doctor pursuant to heightened duty to develop record); *see also, e.g.*, *Richardson v. Apfel*, 44 F. Supp. 2d 556, 563-64

---

[11] Plaintiff contends that, if accepted, Dr. Bruni-Confini's questionnaire responses would require a finding that Plaintiff was disabled at the third step of the disability evaluation process, under "20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04B."  (Pl. Mem. at 4.)  Section 12.04 of the Appendix addresses affective disorders.  *See* 20 C.F.R. Ch. III, Part 404, Subpart P, App. 1, § 12.04.  At the third step of the analysis, a claimant may establish the required level of severity for an affective disorder under this provision, but only where the claimant shows that the disability meets the requirements of *both* Section 12.04A *and* 12.04B.  *See id.*; *see also Tavarez v. Barnhart*, No. 05 Civ. 2747 (DLC), 2006 WL 997701, at *3 (S.D.N.Y. Apr. 17, 2006).  Here, Plaintiff has not explained, based either on Dr. Bruni-Confini's responses or any other evidence in the record as it currently stands, how Section 12.04A would necessarily be satisfied if the ALJ were to accept Dr. Bruni-Confini's opinion.

(S.D.N.Y. 1999) (remanding case as defendant failed to seek out clinical or diagnostic findings and did not provide court with valid explanation as to why it did not seek out such information from treating physician (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 117-18 (2d Cir.1998))); *Rosa*, 168 F.3d at 80); *but see Rivera v. Barnhart*, No. 05 Civ. 6638 (SAS), 2006 WL 1227276, at *6 (S.D.N.Y. May 5, 2006) (ALJ is not obligated to request a statement or records concerning how treating physician reached conclusions in questionnaire when questionnaire already asked for information).

### 2.   The Absence of Evidence From the Records of Dr. Basulto

Dr. Basulto, who was indisputably one of Plaintiff's treating physicians, reported in March 2002 that Plaintiff was suffering from chronic lower back pain syndrom due to a central annulus tear and central disc bulge, and that she was therefore "unable to work."  (R. at 78.)  In assigning Dr. Basulto's opinion limited evidentiary weight, the ALJ stated the following:  "In light of several evaluations performed by independent physicians which consistently document minimal objective findings of limitation, it is apparent that the treating physician's report is an overstatement unsupported by the medical evidence."  (*Id.* at 23.)

The ALJ, however, had scant information before him from Dr. Basulto.  Plaintiff's testimony, as well as other record evidence, indicate that Plaintiff visited Dr. Basulto every three or four months for several years – from at least September 1998 to March 2003.  (*See supra* at 7.)  Yet the administrative record contained only two reports from Dr. Basulto, and no ongoing treatment records.  In similar cases, where gaps in the administrative record, if filled, could have substantiated the treating physician's opinion, courts in this circuit have concluded that the ALJ's failure to develop the record constituted legal error warranting remand.  *See, e.g.*,

25

*Rosa*, 168 F.3d at 79 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (citing *Schaal*, 134 F.3d at 505)); *Botta v. Barnhart*, No. 05 Civ. 4382 (ADS)(ARL), 2007 WL 486730, at *13 (E.D.N.Y. Feb. 13, 2007) (remanding where ALJ believed that treating physician's examination of plaintiff to be "cursory" as ALJ should have requested medical records from treating physician when it was apparent that administrative record was sparse in this regard); *Villanueva v. Barnhart*, No. 03 Civ. 9021 (JGK), 2005 WL 22846, at *10-*11 (S.D.N.Y. Jan. 3, 2005) (finding that ALJ inadequately developed record where there were gaps in the medical records that should have supported treating physician's opinion).

In this case, the Commissioner contends that the ALJ's decision not to seek additional records from Dr. Basulto was reasonable and justified. In support of this contention, the Commissioner states that the ALJ made two attempts to obtain all of Plaintiff's medical records from CPMC, Dr. Basulto's employer, but that the hospital only responded with the delivery of records of other doctors. (Def. Mem. at 19; Def. Reply at 3, 4.) Yet, despite these statements by the Commissioner, it is not clear from the administrative record that the ALJ did, in fact, make two attempts to obtain Dr. Basulto's records. *See Suriel v. Comm'r of Soc. Sec.*, No. 05 Civ. 1218 (FB), 2006 WL 2516429, at *4 (E.D.N.Y. Aug. 29, 2006) (noting that attempts to secure evidence must be detailed in record). Moreover, even if the ALJ did make two requests, the Commissioner does not allege that those requests were made by subpoena, and it therefore appears that the ALJ did not take adequate steps to obtain Dr. Basulto's records.

At a minimum, the ALJ should have informed Plaintiff, in advance of his determination, that he was inclined to reject Dr. Basulto's conclusions unless the doctor provided objective

evidence in support of his opinion.  This would have given Plaintiff an opportunity to approach

the doctor herself, to try to obtain the supporting records.  *See Rosa*, 168 F.3d at 79-80

("Confronted with [a] situation [where ALJ only had sparse notes from treating physician] the

ALJ should have taken steps directing [Plaintiff] to ask [doctor] to supplement his findings with

additional information." (citation omitted)); *Cruz*, 912 F.2d at 12 (finding that, even where ALJ

had sent letter to claimant's treating physician requesting additional information, the ALJ should

have also informed plaintiff of his skepticism of the doctor's opinion, and the ALJ's failure to do

so was tantamount to a failure to develop the record); *Echevarria v. Sec'y of Health & Human

Servs.*, 685 F.2d 751, 756 (2d Cir. 1982) ("Before the ALJ can reject an opinion of a *pro se*

claimant's treating physician because it is conclusory, basic principles of fairness require that he

inform the claimant of his proposed action and give him an opportunity to obtain a more detailed

statement." (internal quotation marks and citation omitted)).  As there is nothing in the record

suggesting that the ALJ informed Plaintiff of the critical absence of Dr. Basulto's supporting

records, it appears that the ALJ, in this case, did not satisfy his obligation to assist Plaintiff in

developing the record fully.

       The Commissioner also suggests that the ALJ was relieved of his obligation to seek

additional evidence or clarification from Dr. Basulto by the concession contained in the doctor's

December 2003 questionnaire responses that, "based on information in [Plaintiff's] chart," he

was "unable to complete" the section requiring him to assess Plaintiff's ability to work.  (Def.

Reply at 3-4 (citing 20 C.F.R. § 404.1512(e)(2)); R. at 421.)  According to the Commissioner,

this notation by Dr. Basulto shows that requesting additional information from him would have

yielded no further useful information or altered the ALJ's determination.  The notation in

question, however, even if read to demonstrate that Dr. Basulto had an insufficient basis to evaluate Plaintiff's ability to work as of December 2003, does not address whether there was additional evidence in Dr. Basulto's records that would have supported his *earlier* conclusion that, as of March 2002, Plaintiff was unable to work.

At the time he completed the December 2003 questionnaire responses, Dr. Basulto had not examined Plaintiff for over eight months.  He may have believed that the questionnaire was asking for his opinion as to Plaintiff's ability to work as of the date of his response, not at some earlier point in time.  Indeed, the questionnaire to which Dr. Basulto responded appeared to ask for his opinion on Plaintiff's current functional capacity.[12]  Records from Dr. Basulto's earlier examinations of Plaintiff may well have been available, and may have supported his earlier assessment regarding Plaintiff's claimed disability.  Instead of speculating as to the meaning of Dr. Basulto's ambiguous notation on the December 2003 questionnaire responses, the ALJ should have attempted to contact the doctor for clarification.

In determining whether Plaintiff is entitled to disability benefits, it is necessary to consider every period during which Plaintiff may have been disabled, beginning on the date of her application (April 2001) through the date of the ALJ's decision (February 2004).  *See Santiago v. Massanari*, No. 00 Civ.3847 (GEL), 2001 WL 1946240, at *16 (S.D.N.Y. July 16, 2001) ("For purposes of SSI benefits, plaintiff should receive benefits for any period of disability she can establish between her application date . . ., and the date of the ALJ's decision . . . ." (citing 20 C.F.R. § 416.335 (2001))); 20 C.F.R. § 416.330 (2001)); *Pena v. Barnhart*, No. 01

---

[12] The questionnaire asks the doctor completing the report to "base your answers on how your patient's medical condition(s) affect his/her ability to function," and the questionnaire advises the doctor that the SSA is trying to determine "whether your patient is actually capable of performing gainful activity."  (R. at 417, 419.)

Civ. 502 (BSJ) (DF), 2002 WL 31487903, at *11-*12 (S.D.N.Y. Oct. 29, 2002) (recommending remand so that ALJ could make specific findings on question of whether Plaintiff was entitled to disability benefits for any past closed period, even if ALJ should find that Plaintiff is not entitled to such benefits on going-forward basis).  Had Dr. Basulto been asked to supplement the record, he might have been able to produce reports or treatment records supporting his conclusion that Plaintiff was in fact disabled for at least some closed, continuous period of not less than 12 months.  As the ALJ failed to take sufficient steps to obtain Dr. Basulto's complete treatment records, remand for further development of the record in this regard is warranted.

For these reasons, I recommend that the Court remand this matter with instructions to the ALJ to seek additional information from both Dr. Bruni-Confini and Dr. Basulto, in support of any opinions expressed by either of these treating physicians regarding Plaintiff's inability to work at any time during the alleged period of her disability.

## <u>CONCLUSION</u>

For the foregoing reasons, I recommend that the case be remanded to the ALJ for further proceedings so that the ALJ may:  (1) either give controlling weight to the opinions of Plaintiff's treating physicians, including Dr. Bruni-Confini, or set forth good reasons for not doing so; (2) seek to develop the record with the examination and treatment records of Dr. Bruni-Confini and Dr. Basulto, and, if the records can be obtained, determine whether they provide support for these doctors' expressed opinions regarding Plaintiff's ability to work; and (3) based on a fully-developed record, determine whether, if Plaintiff is not entitled to disability benefits going forward, she is nonetheless entitled to benefits for any past, closed period.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have ten (10) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New York

10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York, 10007. Any requests for an extension of time for filing

objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN TEN

(10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300

(2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*,

714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        May 1, 2007

                              Respectfully Submitted,


                              DEBRA FREEMAN
                              United States Magistrate Judge

30

Copies to:

Hon. Laura T. Swain, U.S.D.J.

Christopher James Bowes, Esq.
Center For Disability Advocacy Rights, Inc.
841 Broadway, Suite 605
New York, NY 10003

Susan Branagan, Esq.
Assistant U.S. Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007